UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------

NICHOLAS KOLLIAS,

           Plaintiff,

-vs-

UNIVERSITY OF ROCHESTER,

           Defendant.

-------------------------------------------------------------------

**COMPLAINT**

Index No.: 2018 - _____

## PLAINTIFF'S COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, NICHOLAS KOLLIAS ("Niko"), by his attorneys, CONNORS LLP and LEVIN, RIBACK, ADELMAN & FLANGEL LAW GROUP, alleges the following:

### INTRODUCTION

1.    "I just wanted to survive.  I was pushing myself through to not give up and not close my eyes because I didn't want to die."

2.    These are Niko Kollias's own words describing his harrowing abduction, which took place from December 5-6, 2015.

3.    Violent, unknown assailants — people he had never met and for whom he could not even begin to guess their motives — abducted and tormented him for forty hours.

4.    His captors shot him and beat him with household items, such as glass fluorescent light bulbs and irons.

5.     They physically, sexually, and psychologically tortured him as he pleaded with them to stop, every moment wondering what these people wanted and why this was happening to him.

6.     At the time of his abduction, Niko was a senior at the University of Rochester.

7.     He was a member of the University of Rochester's Division III football team.

8.     Niko was the consummate University of Rochester student — he excelled academically, athletically as a football player, and musically as a classical pianist.

9.     On December 4, 2015, Niko was enjoying a typical Friday night out with his friends when, inexplicably, his life changed forever.

10.    He and his football teammate, Ani Okeke Ewo ("Ani"), made plans to meet up with two girls.

11.    One of the two girls had contacted Ani earlier in the week through Facebook.

12.    On Friday, December 5, 2015, the girls invited Niko and Ani to a party.

13.    Like most students at elite universities, Niko had no reason to believe that these two girls would set off what would unquestionably become the worst two days of his life.

14.    But that is exactly what happened.

15.     The girls were a "honey trap," part of a conspiracy to exact revenge upon Niko's teammate, Isaiah E. Smith ("Smith"), who had orchestrated a drug robbery on campus against local drug dealers.

16.     But Niko had no involvement in the drug heist.

17.     In fact, Niko had no knowledge that a drug heist had even occurred on his campus when he agreed to meet the girls.

18.     In other words, Niko was completely in the dark regarding Smith's drug robbery — or that he faced any risk regarding attempts for revenge.

19.     He had no reason to be cautious, suspicious, or otherwise on guard because he had no information suggesting that he should be.

20.     To Niko, he was simply joining his friend at a party on a Friday night.

21.     That all changed when Niko entered Samantha Hughes's car.

## THE PARTIES

22.     Plaintiff, NICHOLAS KOLLIAS, is a resident of the State of Illinois, County of Cook, and City of Chicago.

23.     Niko was a student at defendant, UNIVERSITY OF ROCHESTER, from 2012 through 2016.

24.     Niko was a member of the football team, the Yellow Jackets, from 2012 through 2015.

25.     Defendant, UNIVERSITY OF ROCHESTER, is a private university located in the State of New York, County of Monroe and City of Rochester.

## JURISDICTION AND VENUE

26.    Plaintiff brings his complaint pursuant to federal diversity jurisdiction, 28 U.S.C. § 1332, as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.

27.    Venue is proper in this district under 28 U.S.C. § 1391(b)(1) because defendant resides in this district and under 28 U.S.C. § 1391(b)(2) because all or most of the events giving rise to the claims occurred in this district.

## FACTUAL ALLEGATIONS

**A. University of Rochester.**

28.    The University of Rochester (the "University") is a private institution founded in 1850.

29.    It prides itself as being one of the country's top-tier research universities.

30.    The University has a total undergraduate enrollment of 6,386.

31.    Students come from all 50 states and more than 70 countries to attend the elite University.

32.    The University describes itself as one of the "smallest and most collegiate schools among the nation's top research universities."

33.    New York State Education Law § 4605 requires the University to establish and uphold procedures for maintaining public order on its campus.

34.    Pursuant to this statutory duty, the University established a Department of Public Safety ("Public Safety") which "is charged with providing general security services at the University, and takes steps to [e]nsure the

4

maintenance of public order consistent with its mission." *See* University of Rochester – Department of Public Safety: Policies & Procedures, *available at* http://www.publicsafety.rochester.edu/policies.html#authority (last visited Aug. 2, 2018).

35.     Public Safety's mission is to "protect people at the University; inform our community about security issues, personal safety measures, and protective strategies; prevent disruption of University activities and misuse of premises; protect University and personal property against theft or abuse; provide a visible, reassuring, and readily accessible presence; and foster beneficial community relations." *See* University of Rochester – Department of Public Safety – Our Mission, *available at* http://www.publicsafety.rochester.edu/index.html#about (last visited Aug. 2, 2018).

36.     Public Safety employs Public Safety officers who patrol University properties "24 hours a day, seven days a week."

37.     With respect to such patrols, "[i]t is the intention of University Public Safety to provide proactive, preventive patrols in public spaces within University properties.  Public Safety foot patrols of residential areas are conducted with the goal of promoting the health and safety of the residential community; to provide defense of personal and University property; to provide a visible deterrent and security omnipresence to help repress crime and other behavior deemed unacceptable by the University; to assure that building systems are functioning properly; to ensure adherence to University Policy/Procedures/Sanctions and to

cultivate positive attitudes and open avenues of communication with those residing, working and visiting the housing areas." *See* University of Rochester – Department of Public Safety: Services, Patrols, *available at* http://www.publicsafety.rochester.edu/services.html#patrols (last visited Aug. 2, 2018).

38.     Patrols occur on public spaces, i.e., "[a]ny space not considered private living space" and private areas, such as residential and leased housing. Furthermore, patrols may be planned or preventative foot patrols, i.e., "random checks of areas to avoid predictability in patrol methods." *See id.*

39.     The Public Safety officers also respond to emergencies such as "fires, accidents, and physical crimes."

40.     Furthermore, at all times relevant, Public Safety maintained a Public Safety website, which is still available at http://www.publicsafety.rochester.edu/ (last visited Aug. 2, 2018).

41.     The website contains information regarding various Public Safety efforts, on many topics and in many different areas.

42.     In addition, it features a section devoted to "Public Safety Alerts."

43.     The alerts are "published in accordance with the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act, signed into law in 1990." *See* Department of Public Safety – Incident Reporting & Alerts, *available at* http://www.publicsafety.rochester.edu/incidents.html#alerts (last visited Aug. 2, 2018).

6

44.     The Clery Act requires, *inter alia*, that when a crime covered by the Clery Act occurs, campus officials must evaluate if there is a serious or ongoing threat to the campus community and determine if a timely warning needs to be issued to all staff and students.

45.     The Clery Act covers criminal offenses such as robbery, burglary, and aggravated assault.

46.     The Public Safety Alerts published on the Public Safety website currently date back to March 2015.  *See* Exhibit D.

47.     The Public Safety Alerts include on-campus and off-campus incidents, ranging from robbery to home invasions, bomb threats, and fraud.  In other words, the Public Safety Alerts pertain to issues of varying severity both on and off University property.

48.     As such, University students can rely on the Public Safety Alerts to provide them with information about campus safety.

49.     For example, on August 27, 2015, the University issued a Public Safety Alert about an off-campus home invasion.  The alert stated "[t]he University of Rochester Department of Public Safety learned this morning of a home invasion style robbery that occurred last night at an off-campus student residence in the Congress Avenue neighborhood.  There were no injuries.  The Rochester Police have made an arrest in this incident and the investigation is continuing." *See id.*

50.     Two months later, on September 27, 2015, an alert described that "[t]his evening at approximately 8:30 pm a university undergraduate was the victim

of a robbery on the sidewalk in front of the ITS center along Library road.  Three
suspects grabbed the victims cell phone as they rode past on bicycles.  The trio were
observed crossing the pedestrian bridge immediately after the robbery occurred.
There were no weapons threatened or displayed and the victim was not injured.
The Rochester Police were contacted and assisted in a search of the area.  Anyone
having information about this crime is asked to contact the Public Safety at 275-
3333." *See id.*

51.     On November 8, 2015, the University issued an alert stating "[t]wo
undergraduate students reported being struck by BB's fired by unknown subjects in
two separate incidents earlier this evening.  The first incident occurred on the
pedestrian bridge at approximately 6:40 pm, and the second around 6:50 pm along
South Plymouth Avenue.  One student was not injured and the second suffered a
bruised leg.  University Public Safety and Rochester police are investigating these
incidents.  URDPS will be increasing patrols in the area of the bridge, Brooks
Landing and Crossing and along South Plymouth Avenue near Riverview." *See id.*

52.     On May 26, 2016, an alert detailed an "off site" robbery reported to the
University by the Brighton Police Department.  One day later, the University
provided an update alerting students that "the Brighton Police Department had
made an arrest associated with the robbery that occurred at Clinton Crossings."
*See id.*

53.     On October 30, 2016, the University issued an alert noting that "[a]n
undergraduate student reported being struck by BB's that had been fired from a

dark colored vehicle as he and a group of friends walked on Barton Street near the Riverview complex early this morning around 1:00a.m.  There is no other description of the vehicle or person(s).  The student did sustain minor injuries to his back and was treated at the scene.  University Public Safety and Rochester police are investigating this incident." *See id.*

54.     Likewise, on February 17, 2017, the University published an alert stating that "[w]e learned today, that last evening at approximately 7:00 p.m. a University undergraduate student was the victim of an armed robbery in the area of Terrace Park and Genesee Street.  He was confronted by two individuals, one who displayed a handgun and demanded that the student turn over his property.  The student complied and the two suspects ran from the area, there were no injuries.  The Rochester Police have been contacted and are investigating." *See id.*

55.     On September 27, 2017, the University issued an alert regarding a robbery of an undergraduate student off campus.  The alert stated that "[t]his evening at approximately 11:00 pm a University undergraduate was the victim of a robbery along Genesee Street near Spruce Ave.  Two individuals, one on a bicycle, one on a skateboard approached the student, displayed a handgun, and demanded the student's bag and cell phone.  The student complied with the suspects' demands and they then fled the area.  There were no injuries.  The student contacted UR Public Safety and the Rochester Police who responded and searched the immediate areas for suspects."  In addition, the alert provided safety tips such as "stay aware

of your surroundings," and "install a 'find my phone' type app on your phone or computer." *See id.*

56.     Thus, before and after the relevant time period, the University routinely issued Public Safety Alerts. *See id.*

57.     The Public Safety Alert page, however, does not contain **any** alerts between November 10, 2015 and December 5, 2015, the relevant dates. *See id.*

## B. The University's Changing Football Culture.

58.     The University maintains a National Collegiate Athletic Association ("NCAA") Division III football team.

59.     The team participates in the Liberty League, which includes: Bard College, Clarkson University, Hobart College, Ithaca College, Rensselaer Polytechnic Institute, Rochester Institute of Technology, St. Lawrence University, Skidmore College, Union College, Vassar College, and William Smith College.

60.     As a member of the NCAA Division III, the University is bound by the NCAA Division III rules and regulations.

61.     Pursuant to these rules, and as a Division III institution, the University is expected to "[a]ssure that the actions of coaches and administrators exhibit fairness, openness and honesty in their relationships with student-athletes." *See* Exhibit A.

62.     Indeed, according to NCAA rules, "[i]t is the responsibility of each member institution to control its intercollegiate athletics program in compliance with the rules and regulations of the Association.  The institution's president or

chancellor is responsible for the administration of all aspects of the athletics program, including approval of the budget and audit of all expenditures." *See id.*

63.     Furthermore, "[i]t is the responsibility of each member institution to protect the health of and provide a safe environment for each of its participating student-athletes." *See id.*

64.     It is also "the responsibility of each member institution to establish and maintain an environment that fosters a positive relationship between the student-athlete and coach." *See id.*

65.     With these responsibilities in mind, if the University athletic department staff members or others employed by the intercollegiate athletics program have knowledge of a student-athlete's use, at any time, of a substance on the list of banned drugs — which includes "street drugs," — it "shall follow institutional procedures dealing with drug abuse or shall be subject to disciplinary or corrective action," by the NCAA.  *See id.*

66.     Each member of the University football team, including Isaiah E. Smith, was required to sign a form promising that he would not use, solicit, and/or sell street drugs, including marijuana.

67.     In fact, at the beginning of each athletic season, the University Executive Director of Athletics required all sports team to attend a presentation on illegal conduct and drug use.  After the presentation, all University athletes were required to sign an agreement that they would abide by the NCAA and University rules regarding the same.

68.     In addition to this University-wide presentation and agreement, the football team was required to sign a team agreement, which was stricter than the University's policy with respect to permissible conduct.

69.     At all times relevant, Scott Greene was the University's head football coach.

70.     Greene was assisted by other coaches, including Jacob Lees and Daniel Kyle.

71.     Greene, a former star-collegiate and National Football League ("NFL") player, became the head coach in 2006 and yielded a sea-shift with respect to the culture of the football team.

72.     At this time, Greene stated that he believed "deeply that this program [could] get to the next level with commitment and support from the University as a whole."  *See* Exhibit B.

73.     Greene expected the players to be "held accountable for the success of the program," and pushed them to "want to win . . . and to compete on every down." *See* University of Rochester – Sports: Football, *New Coach Brings New Attitude on the Field*, *available at* https://www.rochester.edu/pr/Review/V69N1/inrev09.html (last visited Aug. 2, 2018).

74.     Greene's goal was to "get the players to a point where they see what it takes to achieve success."

75.     To this end, Greene instituted a rigorous training regime and expected the athletes to work harder than ever.

76.     In addition, Greene expanded the University's recruiting efforts, leveraging his new program as a selling point for prized recruits.

77.     One such recruit was Isaiah E. Smith, who joined the team in 2014.

78.     Smith came from the Bronx, New York, where he excelled playing football for Park East High School.

79.     At Park East High School, he was lauded as the team's "most valuable player" for three straight seasons and led his high school's league in several statistical categories.

80.     Smith continued his athletic success at the University as its "star linebacker."

81.     Indeed, Smith "[e]merged as a force for the Rochester defense in his freshman season," where he earned honors such as being named to the "D3football.com Team of the Week" and the "Liberty League Defensive Player of the Week."  *See* University of Rochester, 2014 Football Roster, *available at* https://www.uofrathletics.com/roster.aspx?rp_id=2944 (last visited Aug. 2, 2018).

82.     Off the field, Smith also developed a reputation as a significant drug dealer and user on campus.

83.     Smith took enormous pride in this reputation and openly bragged about it to his teammates.

84.      Smith's drug dealing was widely known to many, including the University's football coaches.  Indeed, upon information and belief, even the City of Rochester Police Department ("Rochester PD") knew about Smith's illegal activities.

85.    Despite being known, Smith's drug actively was largely ignored.

86.    In fact, upon information and belief, the coaching staff had at least one meeting regarding drug use and dealing — but never once singled Smith out for his activities.

87.    Unlike other team members, Smith did not face adverse consequences for violating both University and NCAA rules; adverse consequences that should have and would have resulted in his dismissal from school for drug use, dealing, and solicitation.

88.    At least one former team member stated that "[t]he kids who were the better athletes were definitely on a longer leash," and that "[Smith] was one of the best players on the team.  He wasn't going to get kicked off the team."  *See I Just Wanted to Survive*,  Outside the Lines – ESPN, June 29, 2017, *available at* http://www.espn.com/espn/feature/story/_/id/19760676/university-rochester-football-player-kidnapped-tortured-40-hours (last visited Aug. 2, 2018).

89.    Upon information and belief, Coach Scott Greene suspended one second-string football player for driving under the influence.

90.    Upon information and belief, Smith, a starter, was never suspended or reprimanded for dealing drugs the entire time he was on the team.

91.    For Greene, whose Division I and NFL background shaped his coaching tactics, winning was his priority, and he stopped at nothing to get there.

92.    In Greene's view, experience paid dividends, and he used his own experiences to shape the University's football program.

93.    At all times relevant, both Ani and Niko were members of the University's football team.

### C. The University's Star Football Player Orchestrates a Large Drug Heist on Campus.

94.    On Wednesday, November 25, 2015, Thanksgiving recess began for all University students.

95.    As such, Ani and Niko returned to Illinois for the break.

96.    Smith, however, remained in Rochester, staying at his off-campus residence.

97.    On Friday, November 28, 2015, campus security cameras captured Smith jogging across a footbridge that connected the campus to Brooks Crossing, a student apartment complex owned and operated by the University.

98.    The cameras revealed Smith meeting up with three men near Brooks Crossing.

99.    After a brief conversation, the three men moved away from Smith.

100.    At approximately 2:45 p.m., the cameras showed Smith waiving at the three he was speaking to, drawing their attention to a black sedan rolling into the parking lot.

101.    After parking, four men got out of the car carrying four pounds of marijuana.

102.    Smith then led these four men with the marijuana into Brooks Crossing.

103.    The apartment building required a residential key card to enter the building and an additional key to enter the individual apartments.  The University only issued key cards to residents living in Brooks Crossing.

104.    Because Smith was not a resident of the apartment building, he did not have his own key card.

105.    Smith, however, knew two football players who lived in the building, one of which was Ani.

106.    Smith was able to obtain unauthorized access into the building despite the fact that he needed a specific swipe card that only residents of Brooks Crossing possessed.

107.    No security guard or housing manager was present at the door when Smith and the drug dealers entered the building.

108.    As a result, the perpetrators had free, unauthorized access to Brooks Crossing in order to effectuate this felony.

109.    Once in the building, Smith knew Ani kept a spare key hidden in a fire extinguisher box right next to his apartment.

110.    Smith used the key to lead the men into Ani's apartment to effectuate the drug heist for the four pounds of marijuana on campus.

111.    At this point, the three men Smith had waived at came crashing through the apartment door from the hallway, spraying the drug suppliers with pepper spray and hitting them on the head with hammers before taking off with the four pounds of marijuana.

112.   To help sell the ruse, the three attackers struck Smith too, but only lightly, never hitting him with the hammer.

113.   Surveillance cameras showed the drug suppliers walking out of Brooks Crossing using their shirts to stop the bleeding from their heads.

114.   Upon information and belief, Public Safety escorted the injured perpetrators to the hospital for care and further questioning.

115.   For his part, Smith, who was uninjured, pretended he was also a victim of the attack and went with the wounded men to the hospital.

116.   Upon information and belief, Public Safety swiftly contacted the Rochester PD soon after and reported an assault.

117.   The Rochester PD sent an officer to the hospital.

118.   The Rochester PD officer questioned Smith, whose story unraveled quickly.

119.   According to the police report, Smith asked the Rochester PD officer whether "anything which he may say," would "impact his status as a student at the University of Rochester."

120.   When the Rochester PD officer told Smith "he would pass onto the University 'the level of cooperation [he] exhibited,'" Smith folded.

121.   Smith wrote out a statement admitting that he broke into Brooks Crossing because his friend who lived there wasn't home.

122.   Smith further stated that he did not have permission to be in the building and that he "let the three guys in to the apartment that was not [his] because [they] were going to set up the drug dealers."

123.   On November 30, 2015, Smith was arrested and charged with robbery in the first degree, assault in the second degree, and grand larceny in the fourth degree.

124.   Public Safety worked with the Rochester PD to further the investigation.

125.   On November 30, 2015, the Hon. Melchor E. Castro, Rochester City Court, signed an order fixing Smith's bail for robbery in the first degree, assault in the second degree, and grand larceny in the fourth degree at $15,000 cash or bond.

126.   Smith was housed in the Monroe County Jail.

**D. The University Bails its Star Football Player Out of Jail Pending Felony Charges.**

127.   Upon information and belief, Smith made one or more calls to the University's football coaching staff from the Monroe County Jail to discuss his arrest and bail.

128.   Head Coach Scott Greene was one of the coaches that learned of Smith's arrest.

129.   Upon information and belief, Head Coach Greene and his assistant coaches, Jacob Less and Daniel Kyle, learned about the details of the crime, specifically that it involved four pounds of marijuana, that violent weapons were used, and that it occurred on campus at Brooks Crossing.

130.    On the morning of November 30, 2015, Lees, who was senior to Kyle, informed Kyle that Smith had been arrested.

131.    In the afternoon of November 30, 2015, Kyle entered the football office while Lees was on the telephone.  When Lees hung up the telephone, he informed Kyle that he was going to bail Smith out of jail.

132.    In their capacity as University employees, Coaches Greene, Lees, and Kyle made a conscious decision to collect bail money, go to the jail, and post bail to release their star football player, Isaiah E. Smith.

133.    Kyle accompanied Lees to Monroe County Jail.  Because Lees was driving and had difficulty parking, he asked Kyle to go in and sign Smith's bond.

134.    On November 30, 2015, Lees and Kyle, both assistant football coaches, employees of the University, and acting in their capacity as University employees, went to Monroe County Jail to post bail to release Smith from jail.  Before posting bail, they learned from the court documents that Smith had been charged with robbery in the first degree, assault in the second degree, and grand larceny in the fourth degree.

135.    Kyle, acting in his capacity as a University employee, signed the bond and posted the money to release Smith from jail upon charges of robbery in the first degree, assault in the second degree, and grand larceny in the fourth degree.

136.    Coaches Greene, Kyle, and Lees, acting in the scope of their employment for the University, bailed Isaiah Smith out of jail when they knew that Smith had perpetrated a violent drug-deal gone bad on University property.

19

137.    Upon information and belief, both Jacob Lees and Scott Greene thanked Daniel Kyle for helping obtain Smith's release from jail for this robbery and violent crime.

138.    Upon information and belief, Greene spoke with Kyle regarding arranging counsel for Smith.

139.    Upon information and belief, Greene, while in the scope of his employment for the University, made arrangements for Smith to be represented by an attorney with whom Greene was familiar, despite Greene knowing that Smith had been charged with a serious violent felony on campus and inside a dorm, and potentially violated the University's rules and regulations and NCAA rules and regulations regarding drug use.

140.    Upon information and belief, Smith's criminal defense was provided for at a reduced rate based on Greene's connections with the criminal defense attorney.

### E. University Students Return from Thanksgiving Unaware of the Drug Robbery that Occurred on Their Campus.

141.    On or around November 29, 2015, University students — including Ani and Niko — returned to campus from Thanksgiving recess.

142.    Despite the violent assault that had occurred on campus, classes resumed as normal on Monday, November 30, 2015.

143.    Upon information and belief, the University did not alert its students to Smith's drug robbery or the assaults that took place in Brooks Crossing, which is University-owned and operated student housing.

144.    Indeed, according to the Public Safety Alert website, no alert whatsoever was published between November 10, 2015 and December 5, 2015. *See* Exhibit D.

145.    When Niko returned to campus, he had no knowledge of Smith's drug robbery or that anything had transpired at Brooks Crossing.

146.    Upon information and belief, the University, knowing that a violent felony had occurred in Brooks Crossing that involved drugs and weapons and resulted in injuries and blood, hired a cleaning crew to scrub the apartment of blood after the robbery.

147.    Upon information and belief, the University did this in order to conceal the robbery, both generally and from Brooks Crossing residents.

148.    Upon information and belief, the University did not obtain consent from nor did it inform Ani that it was directing a cleaning crew to scrub the residents' room.

149.    Upon information and belief, the University did not alert the residents of Brooks Crossing and/or any other University students regarding the drug deal, robbery, and assault with deadly weapons in the building.

150.    Nor did the University offer a warning or any other precautionary measure to the residents living in Brooks Crossing or University students generally, including Niko.

151.    The University neither moved the students, nor did it explain to the students the gravity or details of what had transpired in the building while they were away on break.

152.    The University did not post anything on the aforementioned Public Safety website informing students that a violent drug heist with deadly weapons and serious injuries had taken place on campus and in campus housing in violation of the Clery Act.

153.    As of November 30, 2015, the University knew that this violent drug heist was perpetrated by one of its football players, Smith, in Brooks Crossing, where two other University football players resided.

154.    The University also knew that through its employees, Greene, Lees, and Kyle, it had caused the release of Smith and that the drug dealers, whom he had attacked, could easily learn that Smith was free on bail.

155.    Such information was critical for the drug dealers to exact revenge. The dealers knew Smith's identity.  They also knew that the residents of the apartment were football players because the apartment prominently featured their jerseys, which displayed their names and numbers.  At the very least, the dealers had three routes for revenge: Smith, the residents of that apartment, or other football players.  Regardless, they would get revenge.

156.    Upon information and belief, the University did not warn the students that retribution for a drug robbery was highly probable in light of the size of the

drug deal, the violence used, and the criminal conspiracy that the University football player, Isaiah E. Smith — a well-known drug dealer — employed.

157.    Despite a violent drug crime having just occurred in their building, Brooks Crossing residents were unaware of the incident and the risk they faced as residents.

158.    No member of the University's football coaching staff communicated the details of the incident to the team in the form of an email or meeting, despite the fact that at least three University coaches (Greene, Lees, and Kyle) had intimate knowledge of the robbery, and more specifically, that it occurred in Ani's room, involved their star player, Smith, four pounds of marijuana, violent weapons and a vicious assault.

159.    Despite one of their team members committing a violent drug robbery at Brooks Crossing, where two other football players lived, the football staff opted to bail Smith out of jail and conceal the incident from the team, just as the University had from Brooks Crossing residents and the general student body.

160.    Knowing the violent and enormous nature of the drug heist and the complexity of the scheme, the coaches, Greene, Kyle, and Lees, in their capacity as University employees, made the conscious decision not to warn the members of the football team to take precautions in the following days and weeks.

161.    This is also true despite the fact that at the time that the crime occurred and at the time the coaches bailed Smith out of jail, the team was still

engaged in post-season workouts and the players saw the coaches and/or communicated with them on a daily basis.

162.    As of November 28, 2015, the University, Public Safety, Brooks Crossing management staff, and at least three members of the football coaching staff knew that a violent drug heist with weapons had occurred on campus; that at least three people had been seriously injured and required hospitalization; the crime scene was covered with blood and had to be cleaned professionally; and that the crime involved a star member of its football team.

163.    Despite the fact that University's administration, Public Safety, campus housing, and at least three members of the football coaching staff possessed knowledge of the drug heist, the University wholly failed to inform, at the very least, the residents of Brooks Crossing and the members of the football team about Smith's drug robbery and the potential for revenge.

164.    Instead, the University actively concealed it.

**F. Niko is Abducted by Violent Assailants.**

165.    On December 4, 2015, days after the robbery, Niko and Ani attended a party at an on-campus fraternity house with other students and members of the football team.

166.    During the fraternity party, Ani told Niko that he had two "girls" that wanted to meet up with them.

167.    Ani explained that days before, one of the girls, Samantha Hughes, sent Ani a friend request on Facebook.

24

168.   Ani accepted the friend request, and the two exchanged Facebook messages and phone numbers.

169.   Ani continued to exchange text messages with Hughes while at the on-campus fraternity party.

170.   Ani sent a picture of Niko to one of the women.

171.   Ani and Hughes agreed to meet up later that evening.

172.   Upon information and belief, Ani invited the women to Niko's apartment, but they declined and asked the men to attend a party with them.

173.   Niko and Ani agreed and the girls, Hughes and her friend, Leah Gigliotti, picked the men up.

174.   Hughes drove Niko and Ani to a house approximately ten minutes away from campus.

175.   Niko noticed that the neighborhood started to change, which made him nervous.

176.   He, however, had no reason to fear the women or question their motives.

177.   Upon arriving at the house, located at 22 Harvest Street, the girls led the two football players through a side door.

178.   As soon as Niko and Ani walked through the door, five to ten masked men came out with bats, pipes, knives, and guns.  The lights went out.  The room went dark.  And forty hours of hell commenced.

179.    Niko sprinted desperately for the door, but he made it only halfway across the room before he felt his left leg shatter from a bullet, collapsing him to the floor and rendering him captive to his assailants.

180.    With Niko's ears ringing from the gunfire, and his heart pounding with fear and utter confusion, the masked men dragged Niko and Ani into a bathroom, held them up against the wall, and duct-taped their hands and legs together, binding them.

181.    The masked men proceeded to physically, sexually, and psychologically torture Niko for approximately forty hours.

182.    Graphic video footage from one of the perpetrator's phones shows Niko's pant leg soaked in blood from various gun shot wounds.

183.    Another video horrifically depicts one of the attackers slamming Niko's head with, *inter alia*, a long fluorescent lightbulb, which shattered into thousands of tiny pieces upon impact.

184.    And, still another, reveals unspeakable images of both Niko and Ani, lying helpless in pools of their own blood.

185.    In addition, the attackers forced Niko and Ani to engage in sexual acts against their will.

186.    During the forty hours of torture, the attackers stole thousands of dollars from Niko.

187.   Other cell phone footage reveals one of the attackers withdrawing thousands of dollars from an ATM, and pulling his mask off right before he received the money.

188.   Terrified, Niko attempted to transfer even more money to his accounts, but, in a recorded telephone conversation with a bank representative, was told that weekend transfers were not permissible.

189.   Chillingly, at the end of the call, with Niko's hope shattered, the bank representative told Niko to have a great weekend.

190.   The perpetrators went on shopping sprees, splurging for jeans, leather jackets, and more.  All the while, their prisoners remained mangled and terrified at 22 Harvest.

191.   On Sunday morning, when Niko's money ran out, the masked assailants became enraged and stormed into the torture room.

192.   The assailants began shooting wildly around Niko and Ani, with shell casings burning their captives' skin upon impact.

193.   Rochester Police Chief Michael Ciminelli stated that he believed "not being able to transfer money on the weekend might have saved Kollias's life," explaining "[t]here's no doubt the absolute intent was, once they got the money from that account, these kids would have been killed.  They certainly had no reason to keep them alive after that.  And every reason to not keep them alive, frankly."

## G. The University's Grossly Delayed Response and Rescue.

194.   When neither Niko nor Ani came home on Saturday morning, December 5, 2015, their respective roommates reported them missing to Public Safety.

195.   Despite the fact that Ani — who lived in the apartment known to the University as having just days before been the scene of a violent drug heist perpetrated by Smith — was reported missing, Public Safety made no effort to connect the two incidents.

196.   It was not until Sunday, December 6, 2015, that Public Safety posted an "alert" on the University of Rochester's Public Safety website stating that "[t]he Rochester Police Department (RPD) and the University of Rochester's Public Safety Department are conducting an investigation into the disappearance of two University students, who were last seen at 2 a.m., Saturday morning in the University's vicinity." *See* Exhibit D.

197.   The alert further advised that neither Public Safety nor the Rochester PD believed there was a "threat to the safety of others at the University." *Id.*

198.   Rather, Ugu Okeke Ewo ("Ugu"), Ani's brother, roommate, and resident of the apartment where the Smith crime occurred, found the first critical clue linking the two crimes.

199.   Ugu showed Public Safety the Facebook friend request he'd previously ignored from Samantha Hughes — one of Niko's captors.

200.    Public Safety then scoured Hughes's Facebook page and discovered that she was friends with one of the men injured in the hammer attack — Smith's drug heist.

201.    Had the University alerted the students to the robbery, Ani could have found the same information.

202.    Public Safety contacted Hughes and set up a meeting on December 5, 2015.

203.    At this point, Public Safety, knowing that two of its students were missing, still had not informed the Rochester PD of the disappearance of Niko and Ani.

204.    Hughes, accompanied by her co-conspirator Gigliotti, lied to the Public Safety officers during this meeting on December 5, 2015.

205.    Hughes acknowledged she had been with Niko, but she said that they had attended a party and she had left Niko there.

206.    Hughes further told the Public Safety officers that she did not recall the address of the party, but she offered to drive the officers around to see whether she recognized the house.

207.    In reality, Hughes and Gigliotti took the officers on a joy ride in the opposite direction, far away from where Niko was being held captive.

208.    The Public Safety officers let Hughes and Gigliotti go without first speaking to the Rochester PD, who had been involved in the investigation of Smith's drug robbery.

209.    Upon information and belief, Public Safety failed to involve the
Rochester PD until after they had met with Hughes and Gigliotti — despite
knowing that the women were connected to Smith's drug heist, that Ani lived in the
apartment where the drug heist occurred, and that Public Safety had involved the
Rochester PD in the investigation into the drug heist.

210.    It was not until **Saturday evening** that Public Safety turned the
investigation over to the Rochester Police, an indisputably more experienced force
with far more resources and which was already involved in the Smith case.  At this
point, nearly twenty-four hours had transpired in Niko's nightmare.

211.    From there, detectives worked with Ugu to reach out to Smith to ask
whether he knew anything about what had happened to Niko and Ani.

212.    Smith then contacted the assailants by phone and offered them
$15,000 to release Niko and Ani.  Without hesitation, the captors said "[w]e don't
want money; we want blood."

213.    Upon information and belief, the University made no contact with
Smith despite the fact that he knew how to contact the kidnappers, that the
University had already determined that the women were connected to the drug
robbery, and despite the fact that the University itself had secured Smith's release
on bail.

214.    Had the University's Public Safety officers contacted Smith, they could
have learned the phone number of the abductors and quickly learned their location.

215.    Had the University's Public Safety officers alerted the Rochester PD immediately, the more experienced force could have done this sooner.

216.    Indeed, Rochester Police Chief Michael Ciminelli stated that "[c]learly this was an unusual situation that needed an immediate response."

217.    As such, once the University finally turned the case over to the Rochester PD, Ciminelli put all of the officers investigating the kidnapping and the hammer attack into the same room to share what they knew while simultaneously mobilizing his SWAT team.

218.    Ciminelli then ordered anyone related to either crime to be pulled in for questioning — including Smith, Hughes, and Gigliotti.

219.    After working in conjunction with the investigators of Smith's robbery, the SWAT team arrived at 22 Harvest on Sunday evening.

220.    The SWAT team found Niko and Ani in a bedroom, badly injured.

221.    Police Chief Ciminelli commented that "[t]he one thing that stood out to me is the almost blank stare they both had on their faces. I've been around a long time. I've seen a lot of things. This one is really in a class by itself in terms of the level of physical and psychological torture. It was as bad as a horror movie."

## H. The University's Cowardly Cover Up.

222.    After Niko was rescued, the University made concerted efforts to obfuscate the otherwise clear connection between Smith's drug heist and Niko's kidnapping.

31

223.   This is so despite the fact that the University knew full well that Niko's abduction was part and parcel of Smith's robbery — and certainly NOT an isolated event.

224.   Indeed, the University repeatedly told students that Niko was kidnapped from an off campus location; that the kidnapping was an isolated incident; and that the kidnapping had no connection to any "prior robbery."

225.   For instance, on December 6, 2015, hours after posting the original Public Safety Alert, Public Safety updated the alert to indicate that Ani and Niko were found.

226.   The safety alert provided no other details whatsoever regarding the circumstances of the kidnapping.

227.   On December 7, 2015, then University President Joel Seligman issued a statement to the University community regarding the kidnapping. *See* Message to the University Community from President Joel Seligman (Dec. 7, 2015), *available at* https://www.rochester.edu/president/student-abduction/ (last visited Aug. 2, 2018).

228.   In this statement, he characterized the incident as "isolated," and emphasized that the Rochester campuses and housing were safe. *Id.*

229.   He encouraged students to "go about their regular routines, attend classes, go to the library and to labs, as they normally do." *Id.*

230.    Of course, nothing could be further from the truth.  Niko's abduction was far from an isolated event and, given that a violent drug heist occurred on campus, the University campus and housing were clearly not safe.

231.    Similarly, Scott Greene emailed the football team roster on December 7, 2015.  *See* Exhibit C.  Ironically, Greene included Smith as a recipient on the email.

232.    In the email, Greene stated that he "met with the investigators from public safety who were involved in this situation and they feel very comfortable that the investigation from their end is complete as it relates to the campus."  *See id.*

233.    Greene directed the players not to "make any statements or text or email anyone or even use Facebook to relay more information that might be speculative and unfounded."  *See id.*

234.    In addition, Greene opined that "[m]oving forward I hope everyone on our team understand the importance of communicating any behavior that could lead to others being harmed directly or indirectly and to please remember that we cannot help you if you don't let us know.  My first priority in life is making sure that those around me are taken care of and in a safe environment to the best of my ability."  *Id.*

235.    This email, however, neglects the fact that Greene had intimate knowledge regarding Smith's robbery and failed to inform the team of this information.

236.    The email neglects that Greene was well aware of Smith's rampant drug dealing prior to the drug robbery, which put the entire football team in danger.

237.    Simply put, it is unclear what additional information Greene needed to prevent him from bailing Smith out of jail; inform the team of Smith's drug heist; and to work to ensure the team understood that revenge was likely.

238.    Greene's intentional failure to do any of the above indubitably endangered the football team.

239.    On December 9, 2015, Seligman issued another message to the community regarding a press release from the Monroe County District Attorney. *See* Message to the University Community from President Joel Seligman Concerning Press Release from the Monroe County District Attorney (Dec. 9, 2015), *available at* https://www.rochester.edu/president/student-abduction-update-dec9/ (last visited Aug. 2, 2018).

240.    President Seligman's message stated that "[a]lthough the victims are students at the University of Rochester, they were not abducted from the University of Rochester campus, or any related student housing." *Id.*

241.    Of course, this is belied by the fact that Niko's abduction — the planning, plotting, and perpetration — began **the minute** the violent heist ended, and the fact that the students were abducted **precisely** because Ani lived in Brooks Crossing and both Ani and Niko were members of the football team.

242.    There was no mention of the link between this crime and the previously undisclosed drug robbery that had occurred just days prior in Brooks

34

Crossing.  This is so despite the fact that the University was well aware of the connection.

243.    On January 6, 2016, Seligman issued another message to the community stating that Ani and Niko were kidnapped from an "off campus location," in the early hours of December 5, 2015.  *See* Message from President Joel Seligman Regarding Grand Jury Indictments Announced by Monroe County District Attorney (Jan. 6, 2016), *available at* https://www.rochester.edu/president/student-abduction-grand-jury/ (last visited Aug. 2, 2018).

244.     In addition, Seligman denied that the kidnapping had any connection to a "prior robbery."  *Id.*

245.    Other than this vague reference to some "prior robbery," neither the University nor Seligman ever made any comment regarding the connection between Smith's drug robbery and Niko's kidnapping.

246.    Moreover, Seligman promised that "the DA's Office has assured us that the kidnapping of our two students took place from an off campus location and appears to be a case of mistaken identity.  Our kidnapped students appear to be the innocent victims of a horrendous crime."  *Id.*

247.    There was no mention of the fact that the "mistaken identity" was actually that of another University student, its football star, Isaiah E. Smith, who days before had perpetrated a large scale, violent drug robbery in University-owned

student housing that set Niko's kidnapping into motion.  Nor was there any mention of the fact that the University knew about the robbery.

248.   In fact, the University went so far as to remove Niko from the University of Rochester football roster — while, astonishingly, keeping Isaiah E. Smith on the roster.

249.   This is further confounding given the fact that by December 2015, Smith was no longer a student at the University of Rochester.

250.   Scott Greene's excuse for this conduct was that the University was protecting the identity of victims — despite the fact that the community notice with Niko's picture remains posted to this day.  *See* Exhibit D.

251.   At a minimum, the University had intimate knowledge of Smith's drug heist.  As such, the University knew that, at the very least, certain groups of students — Brooks Crossing residents and the football team — were at risk as a result of the robbery.  By failing to advise these students regarding the events, as the University had done in other situations hundreds of times through Public Safety Alerts, it placed the students in a dangerous position and, in fact, were responsible for Niko's abduction.

## I.  The University is Publicly Scrutinized.

252.   Upon information and belief, at some point after Niko's kidnapping, the University terminated Daniel Kyle as an assistant football coach at the University.

253.   On June 29, 2017, ESPN featured Niko's story on its *Outside the Lines* segment, after conducting an exhaustive investigation.

254.   The story, authored by Tisha Thompson and Andy Lockett, was titled "I Just Wanted to Survive," and was prominently featured on ESPN's website, ESPN.com, for several days.

255.   In addition, the story garnered a tremendous amount of national press.

256.    The story detailed the torture and agony of Niko's kidnapping.

257.   The story also focused on the University's football culture and the irrefutable connection between Smith's robbery and Niko's kidnapping.

258.   The story stated that both Seligman and Greene declined requests for interviews.

259.   In response to the story, the University issued a press release.

260.   The press release stated that: "The events of December 2015 were truly heinous and we are horrified that our students had to endure them.  We continue to wish them the best.  However, in the current ESPN story, facts represented, characterizations made and conclusions drawn about the University's practices and responses are inaccurate.  The University cooperated with ESPN reporters and producers over several months to offer the information that we could appropriately provide."

261.   The University also stated that "[n]o member of the administration, nor any coaches or University athletics staff members asked Dan Kyle to sign for Smith's release.  This was an unusual occurrence."

262.   On August 3, 2017, Daniel Kyle sued the University of Rochester in Monroe County Supreme Court for defamation and libel *per se* with respect to this statement.

263.   In his Complaint, Kyle alleges that Greene was actively involved in orchestrating Smith's release.

264.   On October 10, 2017, Scott Greene announced his resignation as the University's head coach.

265.   Three months later, on January 11, 2018, University President Joel Seligman announced his resignation.

266.   His resignation followed yet another scandal where the University acted in its own interest over that of its students.

267.   Following complaints regarding a professor's sexual harassment of various students, the University hired Debevoise & Plimpton to conduct an independent investigation.

268.   On January 11, 2018, Debevoise issued a report highlighting the inefficacies rampant in the University's policies and procedures.

269.   In his statement announcing his resignation, Seligman stated that he was "not asked by the board to leave, but after a month or so of reflection I came to believe that the best interest of the university required a fresh start under a new leader."

**J.  Niko's Long Road to Recovery.**

270.    After his rescue, Niko spent close to a month at Strong Memorial Hospital, which is owned by the University of Rochester.

271.    He endured multiple blood transfusions and surgeries.  Indeed, the doctors put a titanium rod through his femur, attaching it with screws in his knee and hip.

272.    Likewise, the doctors surgically removed tiny particles of glass from his eardrum, scalp, and skull.

273.    After four years as a dedicated member of the University football team, not a single football coach visited Niko in the hospital during this period.

274.    Niko will never be the same — physically or mentally.

275.    He lives with the daily physical pain in his body that makes walking, let alone exercise, difficult for him.

276.    Worse still, he lives with the nightmares and terrors of those two days running repeatedly through his head, causing him to relive the trauma and terror over and over again.

277.    Daily, Niko is forced to confront the reality that the University had the power to prevent all of this.  Instead, the University acted in its own interest and hid the robbery in an effort to, among other things, minimize any bad press coverage.  In doing so, the University put its students, specifically Niko, in the zone of danger.

## FIRST CAUSE OF ACTION
### (Negligence)

278.     Plaintiff repeats and realleges each and every allegation in the foregoing paragraphs with the same force and effect as if fully set forth herein.

279.     The University of Rochester, through its Department of Public Safety Department and athletic staff, owed a duty of reasonable care to students attending the University of Rochester, including Niko Kollias.

280.     The defendant breached its duty of care and acted negligently, carelessly, and/or recklessly by, *inter alia*:

a.   Failing to adequately supervise and/or train its athletic staff regarding student-athlete drug intervention;

b.   Failing to enforce its own rules, polices, or procedures prohibiting illegal drug use;

c.   Failing to enforce NCAA rules, policies, or procedures prohibiting illegal drug use;

d.   Failing to implement reasonable measures to stop illegal drug dealing and use it knew or had reason to know were occurring on the University of Rochester football team;

e.   Failing to discipline Isaiah E. Smith for his known drug dealing and use;

f.   Orchestrating and effectuating Smith's release from jail on felony charges, including drug possession with a deadly weapon;

40

g.  Failing to alert other football team members regarding Smith's conduct and arrest;

h.  Failing to provide adequate notice and warning with respect to Smith's robbery at an on-campus apartment complex, despite having a protocol in place to do so and despite having done so on countless other occasions both for on-campus and off-campus incidents;

i.  Failing to advise the residents living in Brooks Crossing to take special precautions in the wake of Smith's drug robbery;

j.  Failing to advise the football team members to take special precautions in the wake of Smith's robbery;

k.  Failing to advise University students that a violent drug heist had occurred on campus and that Isaiah E. Smith was out on bail and there could be retaliation;

l.  Actively taking steps to conceal Smith's robbery by, *inter alia*, employing a cleaning screw to scrub Ani's apartment and failing to advise the residents of Brooks Crossing regarding the robbery;

m. Failing to timely and adequately respond to the abduction despite having information regarding Smith's drug robbery;

n.  Failing to adequately train its Public Safety officers with respect to investigations of this nature;

o.  Failing to enforce its own rules, policies, and/or procedures regarding investigating serious crimes;

41

p.  Failing to acknowledge the connection between Smith's robbery and Niko's abduction after the fact; and

q.  Failing to advise the Rochester PD that two of its students had been abducted so that Rochester PD, with its superior staff and forensic technology, could investigate this crime;

r.  Failing to immediately involve the Rochester PD in a case where the University knew Niko's abduction was linked to Smith's robbery, which the Rochester PD was investigating;

s.  Failing to timely provide the Rochester PD with information the University knew or had reason to know was relevant to ongoing Rochester PD investigations;

t.  Obstructing the Rochester PD investigation by bailing Smith out of jail;

u.  Having assumed a duty by choosing not to timely alert the Rochester PD with respect to Niko's abduction, acting negligently in the performance of that duty; and

v.  Otherwise acting willfully, wantonly, negligently, carelessly, and/or recklessly.

281.  The University's willfulness, wantonness, negligence, carelessness, and/or recklessness caused Niko Kollias to experience pain and suffering.

282.    Specifically, had Niko been provided with the information regarding Smith's robbery, he would have been equipped to make informed decisions in the days and weeks following the robbery.

283.    Likewise, had the University acted upon the information it already had pertaining to the robbery and/or conducted a proper investigation, Niko's torture would have ended sooner.

284.    Further, had the University acted upon the information it already possessed pertaining to the robbery and the knowledge that the Rochester PD was already involved in the related Smith investigation, and involved the Rochester PD as soon as it made the connection between the robbery and the kidnapping, Niko's torture would have ended sooner.  But the University failed to do so.

285.    As a direct and proximate result of one or more of the aforementioned negligent acts committed by the University of Rochester through its employees, the University created a condition that permitted the drug dealers to exact revenge on unknowing students at the University, more specifically, Niko Kollias.

286.    As a direct and proximate result of concealment by the University of the crimes committed on campus, University students, more specifically, Niko Kollias, had no information that a violent crime was committed and to be more careful and vigilant in their day to day activities as students which included whom they socialized with.

287.    The University had the power to prevent Niko's abduction and, failing to do so, mitigate its horrifying result.  All it had to do was inform the students

about Smith's robbery — for which the University had a process in place with its Public Safety Alert system and through which it had done so many times before, or, failing to do so, alert the Rochester PD, which the University already knew was involved in the underlying robbery investigation.  It simply and inexplicably failed to do so in this case, failing Niko both before and after his abduction.  Because of that, Niko will forever suffer, reliving the hours of ineffable torture and terror.

288.   As a result of the foregoing acts and omissions of defendant, UNIVERSITY OF ROCHESTER, plaintiff NICHOLAS KOLLIAS sustained severe and debilitating injuries and damages, including damages for past and future medical, health-care, counseling, therapy, and prescription expenses, past and future conscious pain and suffering (including loss of enjoyment of life), and any other damages (including punitive damages) as permitted by law.

289.   The foregoing acts and omissions on the part of defendant, UNIVERSITY OF ROCHESTER, caused a breach of duty owed to plaintiff, NICHOLAS KOLLIAS, which caused the aforementioned injuries and damages to plaintiff, NICHOLAS KOLLIAS, and without any negligence on the part of plaintiff.

290.   Plaintiff, NICHOLAS KOLLIAS, has suffered damages in an amount that exceeds the jurisdictional limits of all lower courts which would otherwise have jurisdiction, and plaintiff will seek damages in an amount to be proven and determined at the time of trial.

WHEREFORE, plaintiff, NICHOLAS KOLLIAS, demands judgment against defendant, UNIVERSITY OF ROCHESTER, in an amount to be proven and determined at the trial of this action, and such other and further relied as this Court may deem just and proper.

DATED:     Buffalo, New York
           August 3, 2018

/s/ Terrence M. Connors
Terrence M. Connors, Esq.
Caitlin M. Higgins, Esq.
CONNORS LLP
Attorneys for Plaintiff
1000 Liberty Building
Buffalo, New York 14202
(716) 852-5533

Richard I. Levin, Esq.
Bryan S. Flangel, Esq.
LEVIN, RIBACK, ADELMAN,
 & FLANGEL LAW GROUP
Attorneys for Plaintiff
60 W. Randolph, Suite 333
Chicago, IL 60601
(312) 782-6717