UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

NICHOLAS KOLLIAS,

                               Plaintiff,                        DECISION AND ORDER
                                                                           Case # 6:18-cv-6566-FPG

v.

UNIVERSITY OF ROCHESTER,

                               Defendant.
_____

## INTRODUCTION

This is a case about a college student who found out that "*stranger danger*" also includes attractive women who slide into your DMs on Facebook.[1] Plaintiff, Nicholas Kollias ("**Plaintiff**"), was a student at the University of Rochester ("**University**" or "**Defendant**") in December 2015 when he got into the car of two unknown women, thinking that he was going to a party off-campus, but instead, found himself beat and tortured in an unknown location. Plaintiff first initiated a lawsuit against those parties directly responsible for his injuries in 2016. In 2018, he also filed the instant action (the "**Complaint**") against Defendant alleging negligence under New York state law due to the University: (1) failing to notify him of a robbery that occurred on campus, (2) allegedly failing to enforce its student athlete drug use policy, (3) allegedly contributing to the release of Isaiah Smith on bail, and (4) allegedly obstructing the Rochester Police Department's ("**RPD**") investigation of his abduction. ECF No. 1. This Court has jurisdiction to decide the case pursuant 28 U.S.C. § 1332. Following extensive discovery, the University filed the present motion for summary judgement. ECF No. 48. For the following reasons, the University's motion for summary judgment is GRANTED.

---

[1] To "slide into the DMs" is online slang for sending someone an unsolicited direct message on social media slickly and coolly, often for romantic purposes. *See*, Dictionary.com, Slang Dictionary, https://www.dictionary.com/e/slang/slide-into-the-dms/.

1

# FACTS

On the evening of Saturday, November 28, 2015, then University student and football player Isaiah Smith ("**Smith**") orchestrated the robbery of several non-student drug dealers. Smith lured the drug dealers into apartment #74 of University-owned Brooks Crossing ("**BC#74**"), where they were ambushed by three masked men who were conspiring with Smith. These masked men assaulted the drug dealers, pretended to assault Smith, stole money and marijuana, and fled. ECF No. 48-4 at 351. Smith did not live in Brooks Crossing, but gained unauthorized access to the building and to BC#74 without the knowledge of the two students to whom the room was assigned—two twin brothers, Ani Okeke Ewo ("**Ani**") and Ugwu Okeke Ewo ("**Ugwu**"), who were teammates of Smith. *Id.* at 348.

The University's Department of Public Safety ("**DPS**") immediately alerted RPD to the robbery and RPD dispatched officers to the hospital where the victims and Smith had fled. ECF No. 48-4 at 346-49. Within hours, Smith admitted that he orchestrated the robbery and assault and was subsequently taken into custody and charged with multiple felonies. *Id.* at 342. Several DPS employees, three football coaches, and the President of the University all testified at depositions that they were unaware that Smith was selling drugs to students until after the robbery on November 28, 2015. ECF No. 48-2 at 5. As a result of the robbery, the University issued an interim suspension to Smith and banned him from campus. *Id.*

Shortly after the robbery occurred, a Monroe Community College student named Samantha Hughes ("**Hughes**") initiated contact with Plaintiff's friend and fraternity brother, Ani via Facebook. ECF No. 48-4 at 52. Hughes also sent a separate Facebook message to Ugwu. ECF No. 48-4 at 116. Ugwu ignored the message, but Ani replied, believing that Hughes was flirting with him. He testified that he "was just like oh, my God. Somebody likes me, da, da, da." *Id.* at 53,

116. However, in reality, Hughes was connected with Anthony Bovenzi-Ortiz, one of Smith's robbery victims, and colluding with Anthony to execute a retaliation plot on the erroneous belief that Ani and Ugwu were involved in the robbery. ECF No. 48-4 at 94, 117-118, 130. Hughes and Ani thereafter communicated via Facebook on November 28 and November 29, then exchanged cellular phone numbers and transitioned their communication to text messaging. ECF No. 48-2 at 6.

On November 30, 2023, an assistant coach of the football team helped bail Smith out of jail. ECF No. 53-1 at 6.

When students returned to campus after the Thanksgiving holiday break, Ani and Plaintiff spent a lot of time together, and "the incident occurring in [Ani's] apartment was always a topic of conversation every single day." ECF No. 48-4 at 76. On the Monday or Tuesday after the Thanksgiving holiday break, Plaintiff met with Ani at his apartment at BC#74. ECF No. 48-4 at 16. Ani pointed out that, following the "incident that he referred to [] on the phone on November 29th," the carpet had been replaced and the walls had been repainted. *Id.* at 17. Plaintiff testified at his deposition that he knew the "incident" that Ani referred to was that "Isaiah had ripped off some guy named Fabio" in Ani's apartment. *Id.* at 21-22. During that conversation, Plaintiff was told there had been blood on the walls and he also acknowledged that he spotted a "small drop of blood" on the wall. *Id.*

Later in the evening of Friday, December 4, 2015, Plaintiff and Ani attended a fraternity party at their Delta Kappa Epsilon ("**DKE**") fraternity house, which continued into the morning hours of Saturday, December 5, 2015. ECF No. 48-2 at 2. While at the party, Ani and Hughes began texting back and forth and Hughes suggested that they meet up. ECF No. 48-4 at 53. Ani told Plaintiff and others that "some chicks want to hang out off campus" and according to Ani,

3

Plaintiff "jumped for joy." *Id.* at 54. Ani and Hughes arranged to meet in-person at Plaintiff's off-campus apartment at Corn Hill Landing, 270 Exchange Boulevard, Rochester, New York. ECF No. 48-2 at 2. Ani told Hughes that he would bring Plaintiff, and Hughes said she would bring her friend, Leah Gigliotti ("**Gigliotti**"). *Id.*

After 2:00 a.m., on Saturday, December 5, Plaintiff and Ani left the DKE fraternity house and drove to Corn Hill Landing to meet Hughes and Gigliotti in the Corn Hill Landing parking lot. *Id.* at 3. Before the early morning hours of December 5, 2015, Plaintiff had never met nor communicated with Hughes or Gigliotti, and he knew that Ani had never met either woman. Nevertheless, shortly after 2:30 a.m., while in the parking lot at Corn Hill Landing, Plaintiff and Ani entered Hughes's car. *Id.* Hughes said she was taking the group to a "party" at an undisclosed location. *Id.* Hughes drove Plaintiff and Ani to 22 Harvest Street, Rochester, New York. *Id.* Plaintiff entered the house at 22 Harvest Street, where several individuals assaulted him and held him captive.

At approximately 5:30 p.m. on Saturday, December 5, 2015, Ugwu went to DPS headquarters with Plaintiff's roommate to report that Plaintiff and Ani had not come home that day and were last seen when they left the DKE fraternity house after 2:00 a.m. that morning. *Id.* at 4. At 6:04 p.m., a DPS officer notified RPD that two University students had been reported missing. *Id.* A Memorandum of Understanding between DPS and RPD assigns to RPD "primary responsibility and lead agency status" for numerous felonies, including kidnapping, even if those events involve University students. At approximately 6:21 p.m. (less than one hour after DPS received the missing student report), on Saturday, December 5, RPD arrived at DPS headquarters, received a briefing by DPS, and interviewed Ugwu and Plaintiff's roommate. *Id.*

During the evening of Saturday, December 5, DPS officers identified Hughes, contacted Monroe Community College to obtain her phone number, made contact with her by phone, and convinced her to meet in person with RPD for questioning. *Id.* at 5. On Sunday, December 6, after hours of questioning by RPD, Hughes disclosed the location where Hughes had last seen Plaintiff and Ani—22 Harvest Street. *Id.* At approximately 9:20 p.m. on Sunday, December 6, an RPD SWAT team broke into 22 Harvest Street and rescued Ani and Plaintiff. *Id.*

In August of 2018, Plaintiff filed the present negligence action against the University for, among other things, failing to inform him about Smith's robbery that took place at BC#74. ECF No. 1. The case was referred to the Honorable Marian W. Payson, Magistrate Judge, for pretrial matters. On January 19, 2023, University filed a motion for summary judgment. ECF No. 48.

**LEGAL STANDARD**

Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment" if the moving party "shows that there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) ("[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."). "Where the moving party demonstrates 'the absence of a genuine issue of material fact,'" *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (quoting *Celotex Corp.*, 477 U.S. at 323), "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary

5

judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247-48 (1986) (emphasis in original). "Only disputes over facts that might affect the outcome of the suit under the governing law" are "material." *Id.* at 248. A dispute about a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In deciding a motion for summary judgment, the Court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Angulo v. Nassau Cnty.*, 89 F. Supp. 3d 541, 548 (E.D.N.Y. 2015) (quoting another source). "Only when reasonable minds could not differ as to the import of evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991). Indeed, "[i]f, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82–83 (2d Cir. 2004) (citations omitted).

But a "mere scintilla of evidence" in favor of the nonmoving party will not defeat summary judgment. *Anderson*, 477 U.S. at 252. A nonmoving party must do more than cast a "metaphysical doubt" as to the material facts; it must "offer some hard evidence showing that its version of the events is not wholly fanciful." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading....").

6

## DISCUSSION

### I. Plaintiff's Failure to Oppose University's Motion for Summary Judgment

In its motion for summary judgment, the University thoroughly briefed its arguments opposing each of Plaintiff's claims that the University: (1) breached a duty imposed by the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act (the "Clery Act") and/or New York tort law to communicate about criminal events; (2) breached a duty by failing to discipline Isaiah Smith for alleged drug dealing prior to the Drug Robbery; (3) breached a duty when an assistant football coach signed bail paperwork for Smith's release from jail; and (4) breached a duty by concealing the robbery at BC#74 and obstructing RPD's investigation and by otherwise failing to respond appropriately to the missing student report. *See generally* ECF No. 48. Plaintiff submitted a memorandum opposing the University's motion—however, Plaintiff failed to address any of the University's arguments. Instead, Plaintiff raised a new claim for relief in its opposition memorandum alleging that the University assumed a duty to warn. ECF No. 53.

"When a party opposing summary judgment fails to respond to the moving party's argument on a claim, the Court may deem the claim abandoned." *Firemen's Ins. Co. of Washington, D.C. v. Ace Am. Ins. Co.*, 465 F. Supp. 3d 254, 266 (W.D.N.Y. 2020), *aff'd sub nom. Firemen's Ins. Co. of Washington, D.C. v. Story*, 858 F. App'x 20 (2d Cir. 2021) (summary order). Since Plaintiff failed to respond to any of the University's arguments relating to each of Plaintiff's claims, all of Plaintiff's claims in his complaint are deemed abandoned. Furthermore, Plaintiff is precluded from raising a new claim for relief in his opposition memorandum. *See Thomas v. Egan*, 1 F. App'x 52, 54 (2d Cir. 2001) (summary order) ("[I]t is inappropriate to raise new claims for the first time in submissions in opposition to a summary judgment motion."). Accordingly, the Court grants

summary judgment in the University's favor on this basis alone. Nevertheless, because the Court also finds that Plaintiff's claims have no merit, the Court will address each claim in turn.

## II. Failure to Warn under the Clery Act

In his Complaint, Plaintiff alleges that the Clery Act required the University to issue timely warnings to all staff and students if it determines that there is a serious or ongoing threat to the campus community when a crime covered by the Clery Act occurs. ECF No. 1 ¶ 44. Plaintiff alleges that the robbery orchestrated by Smith constituted a crime covered by the Clery Act and that University's failure to issue a timely warning violated the Clery Act. *Id.* ¶ 152 ("The University did not post anything on the aforementioned Public Safety website informing students that a violent drug heist with deadly weapons and serious injuries had taken place on campus and in campus housing in violation of the Clery Act"). Plaintiff further alleges that this violation constituted a breach of its duty to Plaintiff to inform him of the robbery and warn him of potential danger.

Plaintiff's reliance on the Clery Act as the University's standard of care fails as a matter of law because the Clery Act does not create a private cause of action or establish a standard of care actionable in tort. 20 U.S.C. § 1092(f)(14)(A). The relevant language of the statute states:

> Nothing in this subsection may be construed to (i) create a cause of action against any institution of higher education or any employee of such an institution for any civil liability; or (ii) establish any standard of care.

*Id.* The Act goes further to state that "evidence regarding compliance or noncompliance with this subsection shall not be admissible as evidence in any proceeding of any court…except with respect to an action [by the Department of Education] to enforce this subsection." *Id.* § 1092(f)(14)(B). Accordingly, Plaintiff's claim that the University breached a duty to him by failing to issue a timely

warning under the Clery Act fails. Summary judgment is granted in favor of the University on this claim.

### III.  Negligent Enforcement of the University's Drug Policy

Plaintiff alleges that the University negligently failed to enforce its own drug use policy by not disciplining Smith for his drug dealing and drug use. ECF No. 1 ¶ 280(e). Plaintiff's Complaint suggests that but for this negligent enforcement, Smith would not have orchestrated the robbery that led to a retaliatory response from his victims.

"In order to set forth a prima facie case of negligence under New York law, the plaintiff's evidence must establish (1) the existence of a duty on defendant's part as to plaintiff; (2) a breach of this duty; and (3) that such breach was a substantial cause of the resulting injury." *Merino v. New York City Transit Auth.*, 218 A.D.2d 451, 457 (1st Dep't 1996) (citing *Akins v. Glens Falls City Sch. Dist.*, 53 N.Y.2d 325, 333 (1981))

Plaintiff's claim that the University was negligent in its enforcement of its own drug policy fails as a matter of law because Plaintiff has not established the first element of a negligence cause of action: "the existence of a duty on defendant's part as to plaintiff." *Id.* Specifically, "colleges today in general have no legal duty to shield their students from the dangerous activity of other students." *Rothbard v. Colgate Univ.*, 235 A.D.2d 675, 676 (2d Dep't 1997) (quoting *Eiseman v. State of New York*, 70 NY2d 175, 190 (N.Y. Ct. Ap. 1987)). In *Rothbard*, the plaintiff sustained serious injuries when he fell from the second floor of a fraternity house at Colgate University after consuming excessive amounts of alcohol. *Id.* The *Rothbard* plaintiff was under the age of 21 at the time and Colgate had a policy that "no one under the age of 21 shall be served or consume alcohol." *Id.* The *Rothbard* plaintiff alleged that Colgate knew or should have known that this policy was being disregarded routinely, and that failure to enforce the policy should result in liability for his

injuries. The Court did not find any merit in the plaintiff's claim because colleges do not have a duty to shield students from dangerous activities of other students, including those students that served alcohol to the *Rothbard* plaintiff. *See id.*

Here, Plaintiff alleges that the University has a policy against drug use and other drug related activity. *Id.* ¶ 65. Plaintiff also alleges that the University failed to enforce its anti-drug use policy against Smith. However, like *Rothbard*, the University owed no duty to Plaintiff to shield him from Smith's dangerous drug activities. Since Plaintiff has failed to establish such a duty, Plaintiff's cause of action for negligent enforcement of the drug use policy must fail.

Even if the University did owe a duty to Plaintiff to protect him from Smith's drug activities, the University claims to have had no prior knowledge of Smith's drug activities and as such was not on notice to take any action. The University points to several pieces of evidence in the record to support its position that it lacked knowledge of Smith's violations. First, it points to testimony from Ani regarding the coaches' knowledge of Smith's drug activities that Smith "would not be on the team if they knew that, so of course not." ECF No. 48-4 at 46. Next, it highlights that several University administrators, including the athletic director and members of DPS, who each testified at a deposition that they had no knowledge of Smith's drug activities prior to the events that took place on November 28. ECF No. 48-4 at 125, 202. Finally, the University points to a text message that the head football coach sent to an assistant coach when he learned of Smith's drug activities after Smith's arrest and that "95% of campus buys weed from him." ECF No. 48-4 at 363. In the text message, the head coach states, "are you f***ing kidding me…WTF. All of our guys knew and no one did or said anything. I'm serious this is bulls**t. Schedule a team meeting tomorrow morning at 8:00am." *Id.* Based on this context, the Court assumes that when the head coach says "all of our guys," he is referring to the students on the football team. Taken together,

10

this evidence supports the inference that the University and its employees were unaware of Smith's activities prior to Smith's arrest.

Although Plaintiff alleged in his complaint that the University knew about Smith's drug dealing, at his deposition, he testified that Smith "was very open in taking pride in his drug dealing and shared it amongst the team and myself and Ani." ECF No. 53-3 at 5. Essentially, Plaintiff asserts a suspicion that the University had knowledge of Smith's drug activities because he himself had knowledge. It would be mere speculation to assume the University's knowledge based on this assertion alone. *See Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (nonmoving party cannot defeat summary judgment by relying only on allegations in the complaint or self-serving conclusory statements). Plaintiff does not allege that he made the University aware of his knowledge and does not point to any fact in the record that the University knew or was told of Smith's drug activities. Instead, Plaintiff failed to respond to the evidence that Defendant highlighted in its motion for summary judgment to support its version of the facts. Absent evidence to the contrary, this Court can only conclude that there is no genuine dispute of material fact that the University was unaware of Smith's drug activities.

"When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading." *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). Since the University has properly supported its summary judgment motion on this claim with evidentiary materials produced in discovery, and Plaintiff's opposition merely rests on the allegation in his pleading that he recited at his deposition, the University is entitled to summary judgment on this claim.

    **IV.**     **Negligence Regarding the Circumstances Surrounding Smith's Release from Jail.**

Plaintiff alleges, without legal support, that the University breached a duty of care to Plaintiff when an assistant coach helped bail Smith out from jail. The Court disagrees and adopts the University's position that "attaching tort liability to the act of signing a bail bond would effectively undermine the entire bail system and thus violate public policy." ECF No. 48-1 at 31. As previously noted, Plaintiff did not respond to this argument in its opposition to summary judgment. Accordingly, this claim is deemed abandoned.

Even if liability could attach to the University as a result of the assistant coach signing a bail bond, Plaintiff cannot establish causation, the third essential element of a negligence cause of action. *See Merino*, 218 A.D.2d at 457 ("In order to set forth a prima facie case of negligence under New York law, the plaintiff's evidence must establish . . . that such breach was a substantial cause of the resulting injury."). Here, Smith was released on bail on November 30, 2015. It is undisputed that the plot to retaliate against Smith was set in motion on November 28. Smith's release on bail cannot be the cause of Plaintiff's injuries because his release was subsequent to the effect that Plaintiff seeks to attribute to it. *See Billhofer v. Flamel Techs., SA*, 663 F. Supp. 2d 288, 297 (S.D.N.Y. 2009) ("[I]t is an inescapable rule of causality that a cause must precede its effect."). Because Plaintiff cannot support this claim legally or factually, summary judgment is granted in favor of the defendant with respect to this claim.

### V. University's Cooperation with RPD

Plaintiff further alleges that the University failed to "timely provide [RPD] with information the University knew or had reason to know was relevant to ongoing [RPD] investigations" regarding the drug robbery. ECF No. 1 ¶ 280(s). However, this allegation appears

12

to be based more on the version of events dramatized on ESPN[2] rather than the undisputed facts obtained in discovery. Here, emails produced in discovery show that Ugwu and Plaintiff's roommate did not report Ani and Plaintiff missing until 5:29 p.m. on December 5, 2015. ECF No. 48-4 at 366. Upon being notified of the report, James Newell, assistant director of DPS in charge of investigations, informed his subordinates in DPS to "notify RPD immediately." *Id.* at 114. At 6:04 p.m. on that same day, RPD received a missing person notice from DPS regarding Ani and Plaintiff. *Id.* at 149-151. Plaintiff does not dispute these facts.

Based on this record, a mere 35 minutes passed between DPS learning of Ani and Plaintiff's abduction and their contacting RPD of the abduction. Accordingly, there is no dispute as to any material fact regarding the University's cooperation with RPD that would support any conclusion of negligence on the University's part.

### VI. Assumed Duty to Warn

Instead of responding to each of the University's arguments in support of its motion for summary judgment, Plaintiff advanced a new theory of liability in his memorandum in opposition to the University's motion. Plaintiff alleges that the University assumed a duty to warn Plaintiff about the robbery that took place on campus. *See generally* ECF No. 53.

An "assumed duty, or a duty to go forward, may arise once a person undertakes a certain course of conduct upon which another relies." *Heard v. City of New York*, 82 N.Y.2d 66, 72 (1993) (quoting *Nallan v. Helmsley-Spear, Inc.*, 50 N.Y.2d 507, 522 (1980)). "To establish a cause of action for violation of an assumed duty, the plaintiff must show (1) that the plaintiff reasonably relied on the defendant's assumption of a duty and (2) that the defendant's conduct placed the

---

[2] In the Complaint, Plaintiff cites the story of this situation that aired on ESPN. *See* ECF No. 1 ¶ 88 (citing https://www.espn.com/espn/feature/story/_/id/19760676/university-rochester-football-playerkidnapped-tortured-40-hours).

plaintiff in a more vulnerable position than the plaintiff would have been in had the defendant done nothing." *Hong Wu v. Dunkin' Donuts, Inc.*, 105 F. Supp. 2d 83, 94 (E.D.N.Y. 2000) (quoting *Heard*, 82 N.Y.2d at 72); *accord* Restatement (Second) of Torts § 323.

Plaintiff claims that the University voluntarily established a policy of "notify[ing] the campus community of criminal activity that possibly put the campus community at risk" and then negligently failed to follow through with this policy by not notifying the campus community about the robbery that Smith orchestrated. ECF No. 53 at 18. Here, the Court need not determine whether the University assumed a duty to warn because Plaintiff fails to establish reasonable reliance and that he was placed in a more vulnerable position because of the University's alleged failure.

Plaintiff has failed to make a showing that he reasonably relied on the University's alleged assumed duty to warn of criminal activity that possibly put the campus community at risk. The record evidence shows that the Plaintiff was aware of the robbery and that Ani's apartment required a substantial amount of cleaning, including repainting the bloodstained walls. Despite Plaintiff's obvious knowledge of the robbery, he claims that he expected the University to issue a notice if "something big" had happened. ECF No. 53 at 5. In light of the facts known to Plaintiff at the time, it was not reasonable for Plaintiff to rely on the absence of a notification from the University and ignore his own common-sense conclusions regarding the severity of a robbery that resulted in so much blood being splattered in the walls of BC#74 that they had to be repainted.

Moreover, Plaintiff has also failed to show that the University's alleged assumed duty placed Plaintiff in a more vulnerable position than Plaintiff would have been had the University never informed Plaintiff about any crime on campus at all. Plaintiff's theory of liability rests on an alleged pattern of issuing notices regarding criminal activity on campus that "lulled" Plaintiff into a sense of security whenever the University did not issue any such notice. In other words, because

the University did not issue a notice, Plaintiff contends that he felt secure and, implies that because he felt secure, he did not question getting into Hughes' car. By taking this position, Plaintiff impliedly contends that if the University had issued a notice about Smith's robbery, then he would have not felt secure and would not have gotten into Hughes' car. However, this generalized sense of security, or lack thereof, had nothing to do with Plaintiff's decision to get into the car of an unknown person and Plaintiff does not present any evidence to support reaching such a strained conclusion. *See e.g., Brown v. United States*, No. 04 CV 3938, 2007 WL 3124615, at *11 (E.D.N.Y. Oct. 23, 2007) ("Simply stated, had the government no established practice of checking for sandbars at Riis Park, plaintiff would still unfortunately be in the same position that he is today.").

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment under Federal Rule of Civil Procedure 56, ECF No. 48, is GRANTED. The Clerk of Court is directed to enter judgment and close this case.

IT IS SO ORDERED.
Dated: August 30, 2023
      Rochester, New York

_____
HON. FRANK P. GERACI, JR.
United States District Judge
Western District of New York